HANUSZ LAW, PC
John Hanusz (SBN 277367)
Email: john@hanuszlaw.com
553 South Marengo Avenue
Pasadena, California 91101
Telephone: (213) 204-4200

HARBAUGH LAW, PC
Craig Harbaugh (SBN 194309)
Email: craig@harbaugh.law
360 East Second Street, Suite 800
Los Angeles, California 90012
Telephone: (213) 986-8656

Counsel for Julian Pulido

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JULIAN PULIDO (1),<br><br>Defendant. | Case No. 25CR-00147-FLA-1<br><br>**EMERGENCY *EX PARTE* APPLICATION FOR ORDER TO STAY PROCEEDINGS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL**<br><br>**[Proposed Order Filed Concurrently]** |

     Julian Pulido, by and through counsel, hereby applies to this Court for an order staying proceedings in this matter on account of the complete lack of funding for the defense team, including counsel, investigators, paralegals, mitigation specialists, and expert witnesses. The failure to provide funding for the defense function constitutes an ongoing violation of the Sixth and Eighth Amendments to the United States Constitution. Mr. Pulido requests that all proceedings in this matter be stayed until such time as Congress fully restores funding for the defense function. The stay should include all critical stages of the proceedings, including the hearing before the Department of Justice to determine whether Mr. Pulido should be authorized to face

1   the death penalty.

2       This application is based on the attached memorandum of points and authorities

3   and declaration of counsel. The government opposes the relief sought in this

4   application, but does not oppose the *ex parte* nature of the application.

5       The government has indicated that it will file a formal opposition on Thursday,

6   October 9, 2025. The defense has no objection to the government filing its opposition

7   on that date.

8

9   Dated: October 7, 2025                    Respectfully submitted,

10

11                                            *s/ John Hanusz*
                                              John Hanusz

12                                            Counsel for Julian Pulido

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

   I.    INTRODUCTION ...........................................................................................1

   II.  RELEVANT BACKGROUND...........................................................................1

   III.    ARGUMENT .................................................................................................2

     A.  The Sixth Amendment Guarantees a Meaningful Defense ...........................2

     B.  Mr. Pulido's Capital Defense Cannot Operate Without Learned Counsel And Mitigation Experts .........................................................................................3

     C.  Capital Cases Require a Heightened Reliability Standard .............................4

     D.  The Eighth Amendment Demands a Thorough, In-Person Mitigation Investigation Based on Detailed Records Collection And Records And Careful Development of Witness Rapport ...........................................................................7

     E.  An Immediate Stay of Proceedings Is the Appropriate Remedy....................9

     F.  The Stay Must Extend to the Capital Case Review Process..........................11

   IV.    CONCLUSION ...........................................................................................13

DECLARATION OF COUNSEL ...........................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Ake v. Oklahoma,*
  470 U.S. 68 (1985) ........................................................................ 1, 3, 11

*Andrus v. Texas,*
  590 U.S. 806 (2020) ................................................................................ 7

*Ayers v. Belmonte,*
  549 U.S. 7, 21 (2006) .............................................................................. 5

*Buntion v. Quarterman,*
  524 F.3d 664, 675 (5th Cir. 2008) .......................................................... 4

*Doe v. Ayers,*
  782 F.3d 425, 435 (9th Cir. 2015) .......................................................... 7

*Ford v. Wainwright,*
  477 U.S. 399, 414 (1986) ........................................................................ 9

*Gideon v. Wainwright,*
  372 U.S. 335 (1963) ....................................................................... passim

*Harmelin v. Michigan,*
  501 U.S. 957, 993 (1991) ........................................................................ 5

*Landis v. North American Co.,*
  299 U.S. 248, 254 (1936) ...................................................................... 12

*Lockett v. Ohio,*
  438 U.S. 586, 605 (1978) ................................................................. 5, 7, 9

*Murray v. Giarratano,*
  492 U.S. 1, 8-9 (1989) ............................................................................. 5

*Padilla v. Kentucky,*
  559 U.S. 356, 366 (2010) ........................................................................ 6

*Payne v. Tennessee,*
  501 U.S. 808, 822 (1991) ........................................................................ 5

# TABLE OF AUTHORITIES

*Porter v. McCollum*,

    558 U.S. 30, 39-44 (2009) ........................................................7

*Rompilla v. Beard*,

    545 U.S. 374, 390-93 (2005) .....................................................7

*Sampson v. United States*,

    832 F.3d 37, 43 (1st Cir. 2016) .................................................7

*Sears v. Upton*,

    561 U.S. 945, 948-56 (2010).....................................................7

*Skipper v. South Carolina*,

    476 U.S. 1, 6 (1986) ..................................................................5

*United States v. Benavides*,

    No. CR 06-62-M-DWM, 2008 WL 11638169, (D. Mont. Oct. 21, 2008) ...............12

*United States v. Carrillo*,

    No. 20-cr-00265-YGR, 2020 WL 6591198, (N.D. Cal. Nov. 11, 2020) .................12

*United States v. Jameson*,

    No. 18-cr-245 (N.D. Ok. Dec. 23, 2019), ECF 338 .................................12

*United States v. Lopez-Matias*,

    522 F.3d 150, 158 (1st Cir. 2008) ...........................................7

*United States v. McGill*,

    No. 09-cr-2856, 2010 WL 1571200, (S.D. Cal. Apr. 16, 2010) ...............12

*United States v. Morrison,*

    449 U.S. 361, 364 (1981) ..................................................9, 10

*United States v. W. R. Grace*,

    526 F.3d 499, 508–09 (9th Cir. 2008)......................................12

*Wiggins v. Smith*,

    539 U.S. 510, 535-38 (2003).............................................6, 7

## TABLE OF AUTHORITIES

*Williams v. Taylor*,

    529 U.S. 362, 395-99 (2000) ............................................................................ 6

*Woodson v. North Carolina*,

    428 U.S. 280, 305 (1976) (Powell, J.) ............................................................ 5

**Statutes**

18 U.S.C. § 3005 ........................................................................................... 1, 3

18 U.S.C. § 3006A ....................................................................................... 1, 11

18 U.S.C. § 3592(a) .......................................................................................... 5

18 U.S.C. § 3599(a)-(d) ................................................................................... 3

18 U.S.C. §§ 3591-3592 ................................................................................ 12

**Other Authorities**

American Bar Ass'n STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980),

    Standard 4.4-1, 4:53 .................................................................................... 6

American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in

    Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines") Guideline

    10.7 ............................................................................................................. 8

American Bar Ass'n, Supplementary Guidelines for the Mitigation Function of

    Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008)

    ("Supplementary Guidelines"), Guideline 10.11 ....................................... 8

American Bar Association, Guidelines for the Appointment and Performance of

    Defense Counsel in Death Penalty Cases (2003), Guideline 10.4 .............. 4

Dennis N. Balske, New Strategies for the Defense of Capital Cases, 13 AKRON L.

    REV. 331, 358 (1979) ("Importantly, the life story must be complete."); ............... 6

Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty

    Cases, 58 N.Y.U. L. REV. 299, 323-324 (1983) ........................................ 6

Guide to Judiciary Policy, Volume 7A .......................................................... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

At 12:01 am on October 1, 2025, the federal government shut down.[1] As a result, the defense team, including counsel, investigators, paralegals, mitigation specialists, and expert witnesses, must severely limit or pause their representation of Julian Pulido, leaving him stripped of rights guaranteed to him by the United States Constitution. Because the government has abdicated its responsibility to fund his defense, Mr. Pulido respectfully moves this Court for an immediate stay of this potential capital prosecution pursuant to the Sixth and Eighth Amendments to the United States Constitution, *Gideon v. Wainwright*, 372 U.S. 335 (1963), *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Criminal Justice Act (CJA), 18 U.S.C. § 3006A and 18 U.S.C. § 3005. Included in this request is a stay of the scheduled October 29, 2025 meeting of the Capital Review Committee of the Department of Justice, where defense counsel have been requested to present its case as to why the United States should not seek the death penalty against Mr. Pulido. Although counsel have asked for a postponement of that meeting, the government has declined to reschedule it.

### II.    RELEVANT BACKGROUND

On July 3, 2025, the federal government ran out of funds to compensate CJA attorneys and other professionals retained pursuant to the act. Because Mr. Pulido's defense team is funded solely through the Criminal Justice Act, this lack of funding directly and severely impacted its work – at the time of this writing, it has received no compensation for work performed on this case in over three months. Despite this depletion of CJA funding, the defense team continued to work on Mr. Pulido's case

---

[1] S*ee* NPR, The federal government has shut down. Here's what will be affected across the country, (Oct. 1, 2025), https://www.npr.org/2025/09/30/g-s1-90732/government-shut-down (last visited Oct. 6, 2025).

1  on a limited basis with the promise of payment when the budget was replenished on

2  October 1, 2025. This promise proved to be hollow.

3       As of the filing of the instant application, neither a comprehensive budget nor

4  a continuing resolution (CR) are in place and funding for CJA work remains

5  depleted with no indication when that may change. These critical team members can

6  no longer continue to work for free or pay expenses out of their own pocket. With

7  no funding for Mr. Pulido's defense, no member of his legal team – not attorneys,

8  investigators, mitigation specialists, paralegals, or experts – will be paid for their

9  work unless a budget or continuing resolution is passed.

10       The harm stemming from the defunding is especially acute given the

11  upcoming meeting scheduled by the Capital Review Committee, where the

12  Department of Justice is soliciting input from counsel regarding whether it should

13  seek the ultimate punishment. It is the height of unfairness to expect an indigent

14  defendant – whose defense team has been wholly defunded – to make a fulsome

15  presentation as to why his crime is not worthy of that sanction.

16  **III.    ARGUMENT**

17      **A.    The Sixth Amendment Guarantees a Meaningful Defense**

18       The Sixth Amendment guarantees that: "In all criminal prosecutions, the

19  accused shall enjoy the right. . .to have the Assistance of Counsel for his defense"

20  U.S. Const. amend. VI. The Supreme Court has held this to mean "that. . .counsel

21  must be provided for defendants unable to employ counsel unless the right is

22  competently and intelligently waived." *Gideon*, 372 U.S. at 339-40. In *Gideon*, the

23  Court explained:

24  The right of one charged with crime to counsel may not be deemed fundamental
and essential to fair trials in some countries, but it is in ours. From the very

25  beginning, our state and national constitutions and laws have laid great
emphasis on procedural and substantive safeguards designed to assure fair trials

26  before impartial tribunals in which every defendant stands equal before the law.
*This noble ideal cannot be realized if the poor man charged with crime has to*

27  *face his accusers without a lawyer to assist him.*

28  *Id* at 344 (emphasis added).

Since then, the Court has held that criminal defendants are not only guaranteed the right to counsel, but are entitled to effective representation and access to the tools necessary for a meaningful defense. *See Ake*, 470 U.S. at 76 (listing cases). As the Court unequivocally explained in *Ake*:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that *a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. *To implement this principle, we have focused on identifying the basic tools of an adequate defense or appeal, and we have required that such tools be provided to those defendants who cannot afford to pay for them*.

*Id.* at 77 (cleaned up) (emphasis added).

### B.    Mr. Pulido's Capital Defense Cannot Operate Without Learned Counsel And Mitigation Experts

A person indicted in federal court for any death-eligible offense is entitled to appointment of two attorneys, at least one of whom must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Judicial Conference policy is that "[o]rdinarily, 'learned counsel' should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation." Recommendation 1(b), Subcommittee on Federal Death Penalty Cases, Committee on Defender Services Judicial Conference of the United States, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense (approved September 15, 1998). More than two attorneys can be appointed to represent a defendant in a capital case. 18 U.S.C. § 3599(a). In addition to the "learned counsel" requirement of § 3005, minimum experience standards for attorneys appointed in capital cases are set forth in 18 U.S.C. § 3599(a)-(d).

Procedures for appointment of counsel and attorney qualification requirements are further detailed in Guide to Judiciary Policy, Volume 7A, § 620 (Appointment of Counsel in Capital Cases).[2]

Highly skilled and experienced counsel is critical at every stage of a federal death penalty proceeding, and it is important from the outset of a case that death-qualified counsel be appointed to provide representation to defendants charged with a capital crime. Judicial Conference policy makes clear that "[q]ualified counsel must be appointed in capital cases at the earliest possible opportunity." Guide to Judiciary Policy, Vol. 7A, Appx. 2A.

An essential aspect of death penalty defense litigation and the "high quality legal representation" required in capital cases is the building and use of a dedicated and well-functioning team of professionals from various fields. In addition to counsel, the team must include, at a minimum, one or more mitigation specialists, fact investigators, and one member who is able, by experience and training, to screen for the presence of mental or psychological disorders or impairments. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003), Guideline 10.4. ("ABA Guidelines").

### C.    Capital Cases Require a Heightened Reliability Standard

The fundamental truth that "death is different" is a bedrock principle of our criminal jurisprudence which "is always a consideration in the handling of death [penalty] cases." *Buntion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008).

---

[2] The Judicial Conference of the United States has endorsed these guidelines in its October 2016 Model CJA Plan. *See* Guide to Judiciary Policy, Vol. 7A, Appx. 2A: Model Plan for Implementation and Administration of the Criminal Justice Act, XIV.B.9: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.) and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases." *Id*. at 28 (adopted by the Judicial Conference of the United States, Oct. 3, 2016).

1    Accordingly, the Supreme Court has "imposed protections [in death penalty cases]
2    that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957,
3    993 (1991).

4        A foundational protection is that of "heightened reliability." *Woodson v.*
5    *North Carolina*, 428 U.S. 280, 305 (1976) (Powell, J.) ("Because of that qualitative
6    difference [between a sentence of life and death], there is a corresponding difference
7    in the need for reliability in the determination that death is the appropriate
8    punishment in a specific case"). Simply stated, "[t]he finality of the death penalty
9    requires 'a greater degree of reliability' when it is imposed." *Murray v. Giarratano*,
10   492 U.S. 1, 8-9 (1989) (internal citation omitted).

11       Another foundational protection in capital cases is the requirement for
12   individualized sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In
13   *Lockett*, the Supreme Court observed that because "the imposition of death by
14   public authority is so profoundly different from all other penalties . . . an
15   individualized decision is essential in capital cases . . . [and] far more important than
16   in noncapital cases." *Id.*

17       Thus, both the Constitution and the Federal Death Penalty Act require that the
18   jury may "not be precluded from considering, as a mitigating factor, any aspect of a
19   defendant's character or record and any circumstances of the offense that the
20   defendant proffers as a basis for a sentence less than death." *Id.* at 604-05; 18 U.S.C.
21   § 3592(a) (providing that the sentencing jury "shall consider any mitigating factor,
22   including the following [seven specific factors and a 'catch-all' factor]"). *See also*
23   *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("virtually no limits are placed on the
24   relevant mitigating evidence a capital defendant may introduce concerning his own
25   circumstances"). The Supreme Court has defined the jury's task as weighing "the
26   finite aggravators against the potentially infinite mitigators." *Ayers v. Belmonte*, 549
27   U.S. 7, 21 (2006). *See also Woodson*, 428 U.S. at 303-04 (emphasizing "the diverse
28   frailties of humankind."); *Skipper v. South Carolina*, 476 U.S. 1, 6 (1986) (defining

1  mitigation as "anything which might lead a reasonable juror to conclude that life is

2  the appropriate punishment").

3      Investigation is an integral part of the defense function generally. *See*

4  American Bar Ass'n STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980),

5  Standard 4.4-1, 4:53 ("It is the duty of the lawyer to conduct a prompt investigation

6  of the circumstances of the case and to explore all avenues leading to facts relevant

7  to the merits of the case and the penalty in the event of conviction."); *see also id.* at

8  4:54 ("Facts form the basis of effective representation."). Both the standards for

9  practice and Supreme Court precedent establish the centrality of a robust

10  investigation in a death penalty defense.

11      The seminal works in the field have recognized the importance of mitigation

12  investigation since the 1970s and 1980s. *See, e.g.*, Dennis N. Balske, New Strategies

13  for the Defense of Capital Cases, 13 AKRON L. REV. 331, 358 (1979)

14  ("Importantly, the life story must be complete."); Gary Goodpaster, The Trial for

15  Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. REV.

16  299, 323-324 (1983) ("The importance of this investigation, and the care with which

17  it is conducted, cannot be overemphasized."). The ABA later developed guidelines

18  specific to capital defense practice, which courts have regularly applied in assessing

19  the reasonableness of counsel's performance. *See Padilla v. Kentuck*y, 559 U.S.

20  356, 366 (2010) (citing cases) ("We long have recognized that 'prevailing norms of

21  practice as reflected in American Bar Association standards and the like . . . are

22  guides to determining what is reasonable . . .'"). The Supreme Court has called these

23  guidelines "valuable measures of the prevailing norms of effective representation."

24  *Id.* at 367.

25      Between 2000 and 2010, the U.S. Supreme Court found trial counsel

26  ineffective in multiple death-penalty cases for failing to conduct adequate mitigation

27  investigation. *See Williams v. Taylor*, 529 U.S. 362, 395-99 (2000); *Wiggins v.*

28  *Smith*, 539 U.S. 510, 535-38 (2003); *Rompilla v. Beard*, 545 U.S. 374, 390-93

1  (2005); *Porter v. McCollum*, 558 U.S. 30, 39-44 (2009) (per curiam); *Sears v.*

2  *Upton*, 561 U.S. 945, 948-56 (2010) (per curiam). Each case reiterates the centrality

3  and importance of a comprehensive mitigation investigation and presentation in a

4  capital case. The Supreme Court reaffirmed the duty to investigate mitigation

5  evidence thoroughly in *Andrus v. Texas*, 590 U.S. 806 (2020) (per curiam). The

6  Court has cautioned against counsel making decisions in life-or-death cases "having

7  acquired only rudimentary knowledge of [a client's] history." *Wiggins*, 539 U.S. at

8  524.

9       Accordingly, although the issues raised in this pleading are, in varying

10  degrees, applicable to non-capital cases, they must be analyzed here through a

11  "death is different" lens and do not have the same impact outside the capital context.

12  *See, e.g.*, *Sampson v. United States*, 832 F.3d 37, 43 (1st Cir. 2016) (noting that "an

13  already significant legal question is even more so in the context of a capital case,

14  because 'death is different.'"); *United States v. Lopez-Matias*, 522 F.3d 150, 158

15  (1st Cir. 2008) ("We do believe that when the stakes are so high, a smaller quantum

16  of prejudice may justify a sanction").

17/18    **D.    The Eighth Amendment Demands a Thorough, In-Person Mitigation Investigation Based on Detailed Records Collection And Records And Careful Development of Witness Rapport**

19       Because death is different, "so too are the lengths to which defense counsel

20  must go in investigating a capital case." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir.

21  2015) (citations omitted). Counsel must exhaustively explore every aspect of the

22  "defendant's character. . .and any of the circumstances of the offense." *Lockett*, 438

23  U.S. at 604. *See also Wiggins*, 529 U.S. at 396 (reversing based on counsel's failure

24  to "fulfill their obligation to conduct a thorough investigation of the defendant's

25  background.").

26       To meet these fundamental capital defense practice standards, the ABA

27  Guidelines require comprehensive records collection and multiple in-person

28  meetings with clients and witnesses in both fact and mitigation investigation. *See*

American Bar Ass'n, Guidelines for the Appointment and Performance of Counsel
in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003) ("Guidelines")
Guideline 10.7; American Bar Ass'n, Supplementary Guidelines for the Mitigation
Function of Defense Teams in Capital Cases, 36 HOFSTRA L. R EV. 677 (2008)
("Supplementary Guidelines"), Guideline 10.11. Specifically, Supplementary
Guideline 10.11 addresses the "requisite mitigation functions of the defense team,"
which include:

> • undertaking an "ongoing, exhaustive and independent investigation of
> every aspect of the client's character, history, record. . .or other factors
> which may provide a basis for a sentence less than death" 10.11(B);

> • conducting "in-person, face-to-face, one-on-one interviews" with
> biopsychosocial history witnesses or any witness "who would support a
> sentence less than death,"

> • "[m]ultiple interviews [which] will be necessary to establish trust,
> elicit sensitive information and conduct a thorough and reliable life-
> history investigation" 10.11(C);

> • uncovering comprehensive documentary evidence of the client's
> biopsychosocial history for counsel's use, 10.11(D);

> • aiding counsel with the selection and preparation of testifying
> witnesses, lay and expert, 10.11(E); and

> • gathering documentary support for lay and expert witness testimony,
> including biopsychosocial history records, 10.11(F), and aiding counsel
> in gathering and preparing demonstrative evidence that "humanize the
> client or portray him positively" 10.11(G). "The collection of
> corroborating information from multiple sources—a time-consuming
> task—is important wherever possible to ensure the reliability and thus
> the persuasiveness of the evidence." Guideline 10.7 cmt.6.

Many topics that must be explored in a mitigation investigation are highly
sensitive. A competent mitigation investigation will invade often shameful family
secrets like mental illness, substance use, domestic abuse, sexual abuse, and trauma.
A mitigation investigation can be a prolonged invasion into the privacy of a client
and those close to him or her. To obtain reliable mitigating evidence, the mitigation
specialist must treat potential witnesses professionally, recognize and respect the
barriers at play, and commit the time it takes to gain their trust and develop rapport.
Rapport is developed through multiple, in-person meetings with witnesses. A single

1  meeting is rarely sufficient. Rather, "multiple interviews will be necessary to
2  establish trust, elicit sensitive information and conduct a thorough and reliable life-
3  history investigation." Supplementary Guidelines 10.11(C).

4         The mitigation investigation for Mr. Pulido's case has already been
5  compromised by the ongoing CJA funding crisis. At the present time, and for the
6  foreseeable future, it is stalled because the defense continues to be unable to pay
7  mitigation specialists. A mitigation investigation in a death penalty case is always an
8  enormous operation. The mitigation investigation in this case is especially complex
9  and time-consuming. The outstanding mitigation work in this case is daunting; it
10  will require a great deal of time and energy from specialists trained in the field. With
11  no funding for this essential part of Mr. Pulido's defense, the team cannot continue
12  to meet with critical mitigation witnesses, or pursue and digest records, or engage in
13  numerous other mitigation investigation tasks. Mr. Pulido's mitigation investigation
14  is unconstitutionally prejudiced because of this lack of resources.

15         As a result, counsel have grave concerns about the ability to effectively
16  represent Mr. Pulido as required by the Sixth Amendment and to uncover the
17  necessary mitigating information for the jury to make the individualized
18  determination with the "heightened reliability" required by the Eighth Amendment.
19  *See Ford v. Wainwright*, 477 U.S. 399, 414 (1986) (Court's consideration of capital
20  cases has been characterized by "heightened concern for fairness and accuracy");
21  *Lockett*, 438 U.S. at 603-05 (1978) (requiring consideration of all relevant
22  mitigating evidence to avoid "the risk that the death penalty will be imposed in spite
23  of factors which may call for a less severe penalty").

24         **E.      An Immediate Stay of Proceedings Is the Appropriate Remedy**

25         "Cases involving Sixth Amendment deprivations are subject to the general
26  rule that remedies should be tailored to the injury suffered from the constitutional
27  violation and should not unnecessarily infringe on competing interests." *United*
28  *States v. Morrison,* 449 U.S. 361, 364 (1981). The approach taken by the courts "has

1  thus been to identify and then neutralize the taint by tailoring relief appropriate in

2  the circumstances to assure the defendant the effective assistance of counsel and a

3  fair trial." *Id.* at 365. "[T]he constitutional infringement identified" must threaten or

4  present "some adverse effect upon the effectiveness of counsel's representation" to

5  warrant a judicial remedy. *Id.* Without evidence of a prejudicial "impact on the

6  criminal proceeding. . .there is no basis for imposing a remedy" in a case that can

7  otherwise "go forward with full recognition of the defendant's right to counsel and

8  to a fair trial." *Id.*

9  In this case, the prejudice Mr. Pulido faces is immediate. The wholesale

10  failure to fund the defense function creates a situation in which Mr. Pulido is left

11  without the resources necessary to mount a meaningful defense in this potential

12  death penalty prosecution. Mr. Pulido's case exemplifies the constitutional harm

13  *Morrison* warns against. Defense counsel is expected to represent Mr. Pulido

14  without compensation and without the ability to conduct a thorough investigation or

15  consult with adequately funded and necessary experts. These are not abstract

16  grievances or inconveniences; these are violations of his Constitutional rights as a

17  criminal defendant.

18  Indeed, the core of the Sixth Amendment, *Gideon,* and the CJA is the right to

19  a meaningful defense; however, a defense can only be meaningful if it is funded.

20  The CJA funding crisis and subsequent government shutdown are resulting in

21  constitutional injury with direct and adverse effects on counsel's ability to render

22  effective assistance. A system in which CJA counsel and CJA service providers are

23  expected to bankroll the criminal defense of federally prosecuted clients from

24  personal business funds or by going into debt is fundamentally incompatible with

25  the promises of the Sixth Amendment. Allowing Mr. Pulido's prosecution to

26  proceed under these conditions impermissibly places his constitutional rights at the

27  mercy of the government's self-created funding crisis. If the United States

28  contemplates seeking the death penalty against defendants like Mr. Pulido who are

financially unable to obtain counsel and retain experts on their own, it must also fund the means for those defendants to meaningfully defend themselves. *See* U.S. Const. amend. VI; *Gideon*, 372 U.S. 335 (1963); *Ake*, 470 U.S. 68 (1985);18 U.S.C. § 3006A.

The Court has the authority and the obligation to fashion relief that neutralizes the infringement of Mr. Pulido's Sixth Amendment rights. Given Congress's continuing failure to adequately fund the CJA, the appropriate remedy is an immediate stay of all proceedings. The prosecution cannot continue while Mr. Pulido's defense is unable to function effectively due to lack of resources.

### F.    The Stay Must Extend to the Capital Case Review Process

To be meaningful, the stay must extend to all stages of the process, including the submission and presentation to the Capital Case Section.  The Justice Manual, which sets forth procedures in capital cases, requires that, before the United States Attorney or the Assistant Attorney General contemplates requesting authorization to seek death, defense counsel must be afforded "a reasonable opportunity to present information" bearing on the Attorney General's authorization decision. Justice Manual § 9-10.080 (Non-Expedited Decision Submissions).  Defense materials are integral to the package transmitted to the review committee and are considered as part of the review under this section. *Id.*

Central to this framework is the defense submission: mitigation, factual clarifications, legal arguments, consular-notification issues (if applicable), proportionality, relative culpability, mental health and neuropsychological evidence, and victim-family views. Id. The Justice Manual mandates inclusion of any defense materials provided during the review; they are not optional add-ons. The defense presentation must occur before the government forwards its recommendation and is embedded in the decisional pipeline so that the Attorney General's determination is informed by a complete adversarial record. Id. at §§ 9-10.080; 9-10.130.

1    Given the statutory capital framework (18 U.S.C. §§ 3591-3592) and DOJ's

2    weighing standards (Justice Manual § 9-10.140), the defense's ability to investigate,

3    retain experts, develop mitigation, and submit a comprehensive presentation is not

4    merely beneficial—it is structurally required by DOJ protocol and essential to the

5    integrity of the authorization decision.

6    Accordingly, where a federal government shutdown suspends funding for

7    appointed counsel – including learned counsel – the defense cannot meaningfully

8    perform the very functions the Justice Manual and due process require.  Proceeding

9    toward authorization under these circumstances would contravene Section 9-

10   10.080's requirement that defense be given a "reasonable opportunity" to submit

11   materials and would risk an incomplete, one-sided record before the Attorney

12   General.

13   The Court has authority to set deadlines that bear on the authorization process

14   in the case before it. A district court has inherent "power . . . to control the

15   disposition of the causes on its docket with economy of time and effort for itself, for

16   counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).

17   As a general matter, that power encompasses setting deadlines

18   and entering scheduling orders that govern the pace at which litigation must

19   proceed. *See, e.g.*, *United States v. W. R. Grace*, 526 F.3d 499, 508–09 (9th Cir.

20   2008) (en banc). The government's decision whether to seek the death

21   penalty is a case-management gating item; it affects the rest of the schedule. Indeed,

22   courts have entered scheduling orders that include deadlines for a defense mitigation

23   submission even over the government's objection. *See, e.g.*, *United States v.*

24   *Carrillo*, No. 20-cr-00265-YGR, 2020 WL 6591198, at *1 (N.D. Cal. Nov. 11,

25   2020); *United States v. Jameson*, No. 18-cr-245 (N.D. Ok. Dec. 23, 2019), ECF 338;

26   *United States v. McGill*, No. 09-cr-2856, 2010 WL 1571200, at *5 (S.D. Cal. Apr.

27   16, 2010); *United States v. Benavides*, No. CR 06-62-M-DWM, 2008 WL

28   11638169, at *2–3 (D. Mont. Oct. 21, 2008). The Court should do the same here in

order to vindicate Mr. Pulido's Sixth Amendment rights.

**IV.    CONCLUSION**

Because the CJA funding crisis and subsequent shutdown of the federal government denies compensation for defense counsel and other essential members of the defense team and interferes with the defense's ability to retain and compensate necessary experts, Mr. Pulido is actively being deprived of a meaningful defense in violation of the Sixth Amendment, *Gideon*, and its progeny, and the Criminal Justice Act. Accordingly, the Court should immediately stay all proceedings CJA funding is restored.

## DECLARATION OF COUNSEL

I, John Hanusz, do declare and state:

1.　　I am licensed to practice in the State of California, and admitted to practice before this Court. Along with Craig Harbaugh, I represent Julian Pulido in this matter.

2.　　On October 2, 2025, I e-mailed Assistant United States Attorneys Daniel Weiner and Declan Conroy, requesting that the scheduled October 29, 2025 meeting with the Capital Review Committee of the United States Department of Justice – the entity responsible for recommending whether the United States pursue the death penalty against Mr. Pulido – be postponed until such a time as the defense team receives funding. I sent a second e-mail relating to this request on October 6, 2025. Mr. Weiner responded on October 6, 2025, indicating that the committee would not postpone the scheduled October 29, 2025 hearing.

3.　　On October 6, 2025, I e-mailed Messrs. Weiner and Conroy to seek the government's position on the relief sought by this application. On October 7, 2025, Messrs. Weiner and Conroy informed me that the government opposes the relief sought in this application. They further informed me that the government does not oppose the *ex parte* nature of this application.

4.　　Pursuant to the Court's standing order, on October 6, 2025, I informed Messrs. Weiner and Conroy that any opposition to the application must be filed within 24 hours of the filing of the application. Messrs. Weiner and Conroy informed me that they plan to file the government's opposition on October 9, 2025. We informed them that the defense has no objection to the timing of that filing.

Executed this, the 7th day of October, 2025, at Pasadena, California.

*/s/ John Hanusz*
John Hanusz